**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

August 30, 2022

**By ECF and Email**
Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York NY 10007

Re:   **United States v. Durell Charles**
      **21 Cr. 546 (NRB)**

Dear Judge Buchwald,

    This arrest was a wake-up call for Durell Charles. Grateful that he was released on bail, Mr. Charles knew he had a decision to make: regress to the bad influences of his past, or prove to himself and his family that he could be better, as a law-abiding and productive New Yorker. For the past year, Mr. Charles has gotten up every day and made better choices—the right choices. He is the essential, primary caregiver for his house-bound mother, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ he has been a loving and active full-time single parent to his 10-year-old son and an active parent to his other two children; he takes care of his 2-year-old niece daily; and he has been a devoted brother, nephew, uncle, neighbor, and friend. He has also had a perfect track record of compliance on pretrial release, and with the help of Pretrial Services, he has obtained ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ree.

    Mr. Charles possessed a firearm, in violation of 18 U.S.C. § 922(g)(1). He did not use it in any way; he was carrying it for protection. He has spent the last year addressing the underlying fears and paranoia that led him to make that choice. For his crime, Mr. Charles pled guilty before Your Honor and has taken full responsibility.

    No jail time is necessary to achieve the statutory goals of sentencing. See 18 U.S.C. § 3553(a). Instead, a sentence of time served with supervised release, with electronic monitoring and community service, would best serve Mr. Charles, his family, and the community.

**Personal Background**

    Durell Charles was born in 1992, as the only child of his mother and father. His mother had 4 other children, giving Mr. Charles one older sister and one younger brother and two

Honorable Naomi Reice Buchwald                                                                                    August 30, 2022
United States District Judge                                                                                                 Page 2

younger sisters on her side and Mr. Charles also had one older and one younger half sibling on his father's side.

As a baby, Mr. Charles' first home was in a shelter with his mother. His mother recalls that there was rampant theft in the facility. When they obtained their own apartment, his mother struggled to make ends meet. "I didn't really have much growing up being that my mother was a single parent of 5 children." Exhibit A, Letter from Mr. Charles. While they always had some kind of food for dinner, there were occasions when the lights would not work, Mr. Charles' clothes were in poor shape, and eviction notices were regularly posted on their front door. Mr. Charles recalls his parents' relationship being amiable and his father would bring supplies when he could; but his father was also in jail when he was a baby.

By the time Mr. Charles reached kindergarten, : "I think being in the foster care system definitely affected all of my kids in some kind of way." Exhibit D, Letter from Regina Roundtree. Things improved somewhat when an "aunt" took the three kids in. Within a couple of years, the kids were returned to their mother, in an apartment on West 150th Street.

Outside of his home, things were not much better. "It's a rough neighborhood where we live, but it's all we know." Exhibit J, Letter from Reverend Turner. Violence was rampant. Mr. Charles remembers seeing a newspaper article about his mother's friend dying after being tied up in his bathroom. See Exhibit A, Letter from Mr. Charles ("I remember my mother walking me down the street while I cried after seeing his face in the papers"). He recalls: "It's like death was always around me." Id.

Mr. Charles had a hard time in middle school  His sister writes that Mr. Charles "had to be the one to step up and take care of me and our other sister and brother from a young age because we didn't have our parents fulfilling that role," and that as a result, "Durell had to grow up quickly and he never had a childhood of his own." Id.

From that point forward, beginning when he was in middle school, Mr. Charles experimented with

marijuana, which helped him feel calm.  Mr. Charles also struggled with reading, which qualified him for special education courses through high school.  When he was in 10th grade, his girlfriend became pregnant, and he dropped out of school.

    At first, Mr. Charles struggled to meet his new responsibilities.  He "was very young-minded and did not make the right decisions."  Exhibit C, Letter from Mariah Shuemake.  When he was 19 and 24, Mr. Charles sustained two felony convictions and served time in jail.  His godfather writes: "Durell was a black teenager growing up in a predominantly gang filled neighborhood. He was easily influenced by others and succumbed to peer pressure, which led to his first incarceration."  Exhibit F, Letter from Paul Byrd.

    When Mr. Charles came home from prison in 2016, he knew that he had to make changes in his life.  "I have known Durell for about 12 years now and have witnessed some of the great strides he has made to change his life for himself and his family."  Exhibit I, Letter from Terry Solomon.  "In the last year or two, I have witnessed Mr. Charles morph from a young adult into a man. He disconnected from his life and acquaintances of old and has a new purpose and plan for his life."  Exhibit G, Letter from Pia Turner.

    Today, Mr. Charles has matured into a loving, attentive, and present father and son.  "Durell has grown into a very respectable and honorable man."  Exhibit E, Letter from Deshawna Simmons.  Mr. Charles is an essential support for his mother, sisters, children, children's mothers, niece, and the rest of his family members. "Now we're adults…Durell is still the one stepping up to take care of the family."  Id.  "We're all leaning on Durell right now for help, and he's putting an extra foot forward for the whole family."  Exhibit B, Letter from Sheila Lamarr.

    Mr. Charles is the primary caregiver for his mother, and lives with her in an apartment on



Mr. Charles' mother has a home health aide, who is present for approximately 4 hours each day, Monday through Friday, but Mr. Charles is responsible for her during the other 20 hours of each day and full-time on weekends.  His mother writes: "Day to day, Durell is my home attendant and my nurse when no one else is here. He's my help."  Id.

Exhibit B, Letter from Sheila Lamarr.  Mr. Charles' friend, Terry Solomon, who is a trained medical assistant, gives him advice:

is wrong to get advice on what the next best steps are." Exhibit I, Letter from Terry Solomon.

Mr. Charles also takes care of his mother's mental and emotional health. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Exhibit E, Letter from Deshawna Simmons; see also Exhibit D, Letter from Regina Roundtree ("Durell also helps me by spending time with me…it means a lot to have Durell there for the company").

Also in their apartment are Mr. Charles' younger maternal half-sisters, Daranice and Deshawna, and his niece, ▇▇▇ (2 years old). When Deshawna is at work, Mr. Charles stays home to take care of ▇▇▇. See Exhibit E, Letter from Deshawna Simmons. ▇▇▇ mother, Deshawna, writes: "Durell has been a major help and support system in helping me raise my 2-year-old daughter ▇▇▇. I live with Durell and our mom, so Durell plays a daily role in mine and ▇▇▇ lives. Her father isn't in her life so Durell has stepped up and helps with multiple aspects of her upbringing…He's such an important person in her life, sometimes she even calls him her dad." Id. Mr. Charles is close with all of his half siblings, who are now adults with jobs and children of their own.

Mr. Charles is also "an empathetic co-parent, a reliable support system, and a phenomenal father." Exhibit B, Letter from Sheila Lamarr. Mr. Charles is the primary parent for his youngest son, ▇▇▇ (10 years old). ▇▇▇ has lived with Mr. Charles since he was two years old. Every day, Mr. Charles takes ▇▇▇ to school, picks him up, and helps him with his homework. Mr. Charles "is up before his child every morning with all the essentials needed for the day ahead" and every night, "▇▇▇ reads at least two chapters of his books and then discusses the book with Durell." Id. ▇▇▇'s mother writes: "Durell is not only an extremely hands-on parent with ▇▇▇ but he was able to step up where I could not because I live in another state and because of my work schedule. It has helped me out in so many ways to have a reliable support system, not only for my son but for me as well." Id.

Mr. Charles is an active presence in the lives of his other two sons, who live with their mothers. Currently, Mr. Charles has ▇▇▇ (12 years old) to his home every other weekend, but he also is available to help whenever ▇▇▇ mother needs it. For example, during the pandemic shutdown, ▇▇▇ lived with Mr. Charles full-time for a year and a half:

In 2020, when COVID-19 shut the schools down, Durell took ▇▇▇ full time. The day that they announced schools were shutting down because of Covid I spoke to Durell, and he told me to bring ▇▇▇ to his house that very same day…Durell worked with ▇▇▇ school to make sure he understood how ▇▇▇ had to log into classes online. He always made sure that ▇▇▇ ate breakfast and that he and his brother were online for school on time. He always made sure to help ▇▇▇ with his schoolwork, and he showed me that he doesn't play when it comes to the boys' education. Durell had ▇▇▇ from 2020 until schools opened back up in September 2021, and he did a very good job. ▇▇▇ graduated 5th grade this year, and he was very happy to have his father there to celebrate this milestone with him.

Honorable Naomi Reice Buchwald  August 30, 2022
United States District Judge  Page 5

Exhibit C, Letter from Mariah Shuemake. Mr. Charles talks to his third son, ▓▓▓▓ (11 years old), on the phone constantly and they visit as often as possible.

      Mr. Charles is an active and devoted dad to all three boys. He is determined for them to grow up with better influences and role models than he did. "He's really trying to think about what he can do differently to improve his children's lives and show them that any adversity can be overcome with hard work." Exhibit F, Letter from Paul Byrd. "Durell is a very calm person, and that feeds into his parenting style. He is very communicative with the kids, and when it comes to discipline, he believes in talking to ▓▓▓ rather than physical punishment. Instead of jumping straight to a punishment, Durell will explain right from wrong to ▓▓▓ He encourages ▓▓▓ not to make the same mistakes he has in the past." Exhibit C, Letter from Mariah Shuemake. "Durell also wants to make sure his children's futures are bright and they get to pursue their dreams." Id.

      Mr. Charles has also strived to be a force for good in his community. Revered Turner explains: "Durell is also helping other dads in the community. He reminds the other dads that they are setting an example for their kids and should act accordingly. That's the mark of a leader, even if Durell doesn't see himself as one." Exhibit J, Letter from Reverend Turner. The same is true of younger folks: "I have witnessed first-hand Durell mentoring young men corning up in our community to stay on the right track and to stay in school." Exhibit I, Letter from Terry Solomon.

      Mr. Charles also has a good reputation among his neighbors and friends. "Durell is someone who's willing to take the weight of the world on his shoulders for the people around him." Exhibit J, Letter from Reverend Turner. Reverend Turner writes that "Durell was raised…with morals and taught to help those less fortunate than he, and that it is good to give your little to those with less." Id. (discussing Mr. Charles buying food for neighbors that were hungry, assisting the elderly, etc.). His next-door neighbor writes: "I have always noticed that Durell has always been the same as when we were little—so friendly, compassionate and loving. He is always willing to help any one of his neighbors, even people in the street." Exhibit H, Letter from Mayra Ruiz. His close family friend, Terry Solomon, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Solomon writes: "When I mentioned needing home health care to Durell, he offered to be the one to take care of me, just as he's been taking care of his mom. It's indescribable what it means that Durell is so ready and willing to care for me, someone who isn't even his blood, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Exhibit I, Letter from Terry Solomon.

      Over the years, Mr. Charles has done his best to also contribute to his family's income. He has worked for a variety of moving and storage companies. "I like the type of job where you're always on your feet." Exhibit A, Letter from Mr. Charles. He also obtained his OSHA certification.

      A few years ago, Mr. Charles found a creative outlet that inspired him: he became interested in music. "His love of music has changed how he perceives life and society as a whole." See Exhibit F, Letter from Paul Byrd. Mr. Charles was encouraged to create a personality for selling his music that would be appealing to young people; he chose "wild boy" –

which represented qualities that were different than those in his regular life.  He cultivated a persona on social media – including the imagery of guns and gangs that the were referenced in the criminal complaint.  Of course, this is not uncommon,[1] but Mr. Charles now appreciates that this is the wrong way to promote himself.  He explains: "I have peers and kids that may look up to me as a recording artist or just as a person.  I would never want them to think that carrying a firearm is something reasonable or cool to do."  Exhibit A, Letter from Mr. Charles.  Indeed, NYPD began investigating him because of these images.  In addition to being an artist himself, Mr. Charles also tried to learn the business side of the music industry.  He got a job in a recording studio until his federal arrest and obtained an ASCCAP license to distribute music.  "He knows that there is no guarantee his music goals will be realized, so he also wants a 9 to 5 job to support his family."  Exhibit F, Letter from Paul Byrd.

After his arrest, Mr. Charles left his job at the recording studio and returned to moving companies through April 2022.  This summer, Mr. Charles had a lead on a job at Madison Square Garden on the maintenance staff, but he did not have an original copy of his social security card, which they needed to verify his identity.  Mr. Charles has been working with the Social Security Administration to obtain the card.  In the meantime, Mr. Charles obtained alternative off-the-books employment.  He has been doing maintenance work 3-4 days each week.  The superintendent of a building on Edgecombe Avenue hired him to mop the hallways, sweep the floors, take out the trash, and do whatever else the super needs.

<u>Mr. Charles' Experience as a Victim of Gun Violence</u>

In 2014, Mr. Charles was walking through a park in his neighborhood.  As soon as he exited the park and started to cross a street, he heard gun shots.  He fell to the ground.  When he tried to stand up, he realized his leg was badly injured.  He was taken by ambulance to Harlem Hospital, where he learned that a bullet had broken his fibula and tibia bones in his left leg.  Mr. Charles was not the intended target of the shooting; he was an innocent bystander.

From that day forward, Mr. Charles was paranoid.  He realized how much he could lose – even his life – just by living in his neighborhood.  He was overwhelmed by negative thoughts.  Over the next few years, Mr. Charles lost a number of friends to gun violence.  One friend was shot and killed while ordering food and another was stabbed to death.  The husband of his family friend, Terry Solomon, was hit and killed by a stray bullet in Harlem.[2]  Having experienced

---

[1] Mayor Eric Adams has been discussing the proliferation of "music, displaying…guns, violence" on social media sites.  <u>See</u> Timothy H.J. Nerozzi, NYC Mayor Adams targets 'drill rap' videos on social media, saying they promote gun violence, Fox News, Feb. 12, 2022, <u>available at</u>  https://www.foxnews.com/politics/nyc-mayor-adams-drill-rap-videos-social-media-gun-violence.

[2] Esha Ray et al., Cops Nab Suspect for Stray Bullet Slaying of NYC Man Walking Dog After Celebrating Anniversary With Husband, Daily News, Oct. 22, 2019, <u>available at</u> https://www.nydailynews.com/new-york/nyc-crime/ny-harlem-stray-bullet-wedding-anniversary-arrest-20191022-wo36meoppnb2fh7cfoxariq72q-story.html

violence as a bystander himself, Mr. Charles was there for Mr. Solomon, who writes, "When my husband was murdered…Durell was one of the main people in my life that kept me afloat with his encouragement and his assistance when I needed it." Exhibit I, Letter from Terry Solomon.

In 2021, Mr. Charles was extremely alarmed by the rise in gun violence in New York City – and particularly in his neighborhood. Each morning, Mr. Charles was struck by the local tv news recounting the local shootings before they even announced the day's weather. He was constantly reminded of his own shooting injury and he became more and more fearful. ███████████████████████████████████████████████████████████████████████████████████████████████████████████

**Offense Conduct**

On June 3, 2021, Mr. Charles was standing on the street in Upper Manhattan when he saw some NYPD officers. Mr. Charles started running when he saw the police. While running, he dropped a gun in a plant stand outside of a closed restaurant, which the police quickly recovered.

Mr. Charles knew it was wrong to possess a gun and he ran away from the police because he was afraid of being caught. Having been caught, Mr. Charles appreciates how stupid it was for him to carry a gun in the first place, even if it made him feel safer. ███████████████████████████████████████████████████████

Mr. Charles pled guilty before Your Honor and took full responsibility for his criminal conduct. He writes:

> I would like to apologize to you, Judge Buchwald, the government, my community, and my family for the harm I caused and could have caused due to my actions last year. I'm truly sorry not just because of the time I'm facing but because I know that possessing a gun and breaking the law at all is a bad example to set for my kids and my community.

Exhibit A, Letter from Mr. Charles.

He has expressed the same to his family. "I know that Durell feels horrible for the crime he committed. He gets extremely sad and depressed over this situation… I know he wont do anything like this again." Exhibit E, Letter from Deshawna Simmons. "He knows he committed a crime and that his actions will have consequences, but has seen the errors of his ways, and he won't make another poor choice that might separate him from his family." Exhibit B, Letter from Sheila Lamarr. Mr. Charles knows that he should have turned to his community for support sooner: "He has expressed his remorse to myself in candid conversations regarding the mess he

has gotten himself and his family into due to him being immature and not heeding the advice that his family and I were providing to him when he needed it the most." Exhibit G, Letter from Pia Turner.

**Post-Arrest Conduct**

Mr. Charles was arrested on the scene by NYPD officers and released on bail on state charges. The Southern District of New York took the case and Mr. Charles was presented before the Magistrate Court on August 11, 2021 and bail was set. He was released shortly thereafter – and has been successful on pre-trial supervision for more than one year.

For more than 12 months, Mr. Charles has been fully compliant with the terms of his bail. This remained true even after the Court replaced his "home detention" condition with a strict curfew, so he could meet his family obligations. Dkt. No. 8. Even with that increased freedom, Mr. Charles rose to the occasion. He has had been wholly compliant with all the conditions of his bail for more than a year.

"This arrest has been a wakeup call for Durell, it really snapped him into reality." Exhibit B, Letter from Sheila Lamarr. "Every day since [my arrest,] I've been trying to make up for it. I want to be a better father, a better son, a better brother, and a better friend; I just want to make better decisions." Exhibit A, Letter from Mr. Charles. In addition to meeting his obligations to the Court, Mr. Charles has matured in every part of his life:

> In the last year, he has become a much better parent. He's more attentive, he's easier to get in contact with, more personable, more considerate of other people's feelings, and he's more open with his own feelings. He's learning to talk about the things that might be bothering him instead of keeping them inside. Overall, he is more family-oriented. He's very aware that he has 3 young boys that look up to him and setting an example of breaking the law is not the way he wants to raise his sons.

Exhibit B, Letter from Sheila Lamarr.

Mr. Charles describes that when he was arrested for this case, he thought to himself: enough is enough. It was time for him to deal with his problems maturely and in a law-abiding way: ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ Exhibit A, Letter from Mr. Charles.

At his request, Mr. Charles was referred to St. Mark's Institute for Mental Health for treatment by Pretrial Services, which offered him multi-faceted interventions. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄



Just as importantly, St. Mark's has also helped Mr. Charles stay drug free: "He has also been able to obtain and maintain sobriety from opioids since the start of treatment and is determined to maintain that sobriety." Id. Mr. Charles wants to stay sober for himself and for his family. He writes: "I'm proud to say I'm 13 months clean." Exhibit A, Letter From Mr. Charles. After working with him for almost a year,

**Guidelines Calculation**

The correct guidelines range in this case is 30 to 37 months imprisonment.

The parties and Probation agree that Mr. Charles has 5 criminal history points, placing him in Criminal History Category III. See PSR ¶¶ 5(b)(i), 34-5.

Pursuant to U.S.S.G. § 2K2.1, the base offense level in the instant case is 20. See U.S.S.G. § 2K2.1(a)(4)(a). The base offense level is based on Mr. Charles' prior conviction (at age 19) for New York State robbery in the 3rd degree, for which he was originally sentenced to probation (and then was re-sentenced to 1 year in jail). This conviction – while considered a non-violent felony in New York State, is currently considered a "crime of violence" under the guidelines. See id. With three points subtracted for a timely acceptance of responsibility, the adjusted offense level is 17. See U.S.S.G. §§ 3E1.1(a), (b). Thus, the applicable range is 30 to 37 months.

The Government and Probation Use the Wrong Base Offense Level

The government's Pimentel letter and Probation's PSR erroneously use a base offense level of 24, by claiming that Mr. Charles was previously convicted of a "controlled substance offense" in addition to his robbery in the third degree. See PSR ¶¶ 5(a)(iii), 21. They are wrong. Mr. Charles' 2016 conviction for criminal possession of a controlled substance in the third degree, in violation of New York Penal Law § 220.16(1) does not qualify.

Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.16(1), is not a "controlled substance offense"

Mr. Charles' prior conviction is not a controlled substance offense for two reasons: (1) New York's definition of "narcotic drug" is broader than the federal drug schedule because New York includes certain isomers of cocaine that the federal schedule does not, and (2) New York's definition of "narcotic drug" is also broader because it includes naloxegol, which was deleted

Honorable Naomi Reice Buchwald  August 30, 2022
United States District Judge  Page 10

from the federal schedule in 2015. District courts have overwhelmingly agreed with Mr. Charles' position.[3]

A "controlled substance offense" is defined as: "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b).

In determining whether a prior New York state conviction counts as a "controlled substance offense," the Court must apply the categorical approach and compare the elements of the New York offense with the federal definition in U.S.S.G. § 4B1.2(b). See United States v. Townsend, 897 F.3d 66, 72 (2d Cir. 2018). The Court can look "only to the statutory definitions of the prior offenses, and not to particular facts underlying those convictions." Taylor v. United States, 495 U.S. 575, 600 (1990). A defendant's "actual conduct is irrelevant to the inquiry," and "the adjudicator must 'presume that the conviction rested upon nothing more than the least of the acts criminalized'" under the state statute. Mellouli v. Lynch, 135 S. Ct. 1980, 1985 (2015) (quoting Moncrieffe v. Holder, 133 S. Ct. 1678, 1684 (2013)). "If a state statute is broader than its federal counterpart – that is, if the state statute criminalizes some conduct that is not criminalized under the analogous federal law – the state conviction cannot support an increase in the base offense level." Townsend, 897 F.3d at 72. In other words, if the state statute "sweeps more broadly than the generic crime, a conviction under the law cannot count" as a § 4B1.2(b) predicate. See Descamps v. United States, 133 S. Ct. 2276, 2283 (2013).

In comparing the elements of Mr. Charles' prior New York State offense and § 4B1.2(b)'s definition, this Court must apply Townsend's holding: "[t]he term 'controlled substance' in [§ 4B1.2(b)] refers exclusively to those substances in the CSA [the Controlled Substances Act]." 897 F.3d at 75. If Mr. Charles "might have been convicted" under § 220.16(1) "for conduct that is not prohibited by the CSA, his state conviction[s] cannot qualify as…predicated offense[s]." Id.

Applying this legal framework, Mr. Charles' prior New York State conviction is not a "controlled substance offense" because the State statute's prohibition on the attempted sale of "narcotic drugs" encompasses several substances not controlled under federal law.

> (1) New York's Definition of "Narcotic Drug" is Broader than the Federal Schedule because it Includes Certain Cocaine Isomers, which are Not on the Federal Schedule

---

[3] The issue of overbreadth is currently pending before the Second Circuit in United States v. Gibson, No. 20-3049 (2d Cir.). The defendant won below, see United States v. Gibson, 19 Cr. 66, Dkt. No. 53 (W.D.N.Y. Jan. 31, 2020) (Vilardo, J.), and the appeal was brought by the government. Gibson was argued before the Circuit on November 23, 2021. No decision has issued.

New York Penal Law § 220.16(1) has, as an element, the possession with intent to sell "a narcotic drug" which, under New York State law, includes certain cocaine isomers that do not fall within the federal CSA. New York law controls:

> [c]oca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers…

N.Y. Pub. Health L. § 3306, Sched. II(b)(4). The term "isomers" is not elsewhere defined, narrowed or restricted in New York law. Indeed, New York meant for its definition to include "cocaine and all of its isomers." See People v. Burnett, 666 N.Y.S.2d 658, 659 (App. Div. 2d. Dep't 1997) (emphasis added).

In contrast, federal law – which was enacted later in time – controls only the "optical or geometric" isomers of cocaine. 21 C.F.R. §§ 1300.01(b) (2021) (defining the term "isomer" as used in 21 C.F.R. § 1308.12(b)(4)). Indeed, Judge Castel recently found that "[t]here appears to me to be some intention on the part of the draft people of the Federal Regulation to make it different from the broader New York regulation." United States v. Louissaint, 20 Cr. 685, Dkt. No. 35 (S.D.N.Y. Nov. 17, 2021) (Castel, J.).

Accordingly, under the categorical approach, the fact that an indivisible element in the New York statute[4] is broader than its federal counterpart means that Mr. Charles' prior conviction is not considered a "controlled substance offense" under U.S.S.G. § 4B1.2.

District Courts have reached this conclusion repeatedly. See, e.g., United States v. Gutierrez-Campos, 21 Cr. 40, Dkt. No. 60 (S.D.N.Y. Jan. 31, 2022) (Cronan, J.) ("This plain textual reading of the relevant federal regulations compels the conclusion that New York's definition of cocaine, without limitation to particular types of isomers, is categorically broader than the federal definition."); United States v. Louissaint, 20 Cr. 685, Dkt. No. 35 (S.D.N.Y. Nov. 17, 2021) (Castel, J.) ("So the question is does New York's definition control isomers of cocaine that federal law does not? And the answer to that question is yes. New York law, on the face of the statutory text, covers all isomers of cocaine, while federal law confines itself to optical or geometric isomers of cocaine."); United States v. Fernandez-Taveras, 511 F. Supp. 3d

---

[4] The statutory term "narcotic drug" in § 220.16(1) is indivisible because the identity of the particular "narcotic drug" sold is not an element on which a jury must agree. See Harbin v. Sessions, 860 F.3d 58, 67 (2d Cir. 2017) (discussing New York Appellate Division opinions "stat[ing] that different narcotic drugs do not create separate crimes under [N.Y. Penal Law § 220.16(1)], and that jurors need not agree as to the particular drug in question"); see also United States v. Savinon, 21 Cr. 233, Dkt. No. 25 (S.D.N.Y. Oct. 1, 2021) (Liman, J.) ("New York Penal Law 220.16(1) is indivisible in the sense the Second Circuit described it in Harbin."); Gov't Ltr., United States v. Ferrer, 17 Cr. 773, Dkt. No. 23 (S.D.N.Y. Oct. 17, 2018) (Koeltl, J.) ("The Government agrees…that, pursuant to Harbin v. Sessions…the subsection[] criminalizing the sale… of [a] 'narcotic drug[]'—[is] not further divisible by type of narcotic drug.").

367, 374 (E.D.N.Y. 2021) (Garaufis, J.) (concluding that "the New York statute applies on its face to cocaine isomers to which the [Controlled Substances Act] does not"); United States v. Baez- Medina, 20 Cr. 24, Dkt. No. 50 (S.D.N.Y. July 1, 2021) (Koeltl, J.); United States v. Ferrer, 20 Cr. 650, Dkt. No. 25 (S.D.N.Y. July 21, 2021) (Buchwald, J.); United States v. Minter, 20 Cr. 389, Dkt. No. 72 (S.D.N.Y. Oct. 12, 2021)[5] (Koeltl, J.); United States v. Hagood, 20 Cr. 656, Dkt. No. 87 (S.D.N.Y. Mar. 9, 2022) (Engelmayer, J.) ("I find the New York law to be a categorical mismatch with the federal law: the New York law is broader."). In Hagood, in a sentencing just three months ago, Judge Engelmayer also noted: "In so finding, I join what appears to be a uniform bloc of judges in this district—in this circuit, indeed—who have encountered this issue." Id. Just two weeks ago, Judge Gardephe joined this bloc. See United States v. Lawrence, 21 Cr. 127 (Gardephe, J.)[6] (S.D.N.Y. Aug. 18, 2022).

> (2) New York's Definition of "Narcotic Drug" is Broader than the Federal Schedule because it includes Naloxegol, which was Deleted from the Federal Schedule in 2015

Mr. Charles' prior state offense is also not "controlled substance offense" because New York State prohibits the sale of any derivative of opium or opiate, including naloxegol – a substance that, since 2015, is now explicitly excluded from the federal controlled substance schedule. Compare N.Y. Pub. Health Law § 3306, schedule II(b)(1) (defining "narcotic drug" to include "any … derivative … of opium or opiate") with 21 C.F.R. § 1308.12(b)(1) (excluding from the schedule naloxegol).

As with cocaine isomers, the inclusion of naloxegol on the state schedule and its exclusion from the federal schedule means that the statute of Mr. Charles' prior conviction is a categorical mismatch with U.S.S.G. § 4B1.2(b). Mr. Charles' state court conduct took place in 2015 and his conviction took place in 2016 – which both followed the deletion of naloxegol from the federal schedule.[7] In fact, until recently, the government conceded that convictions sustained by defendants for New York State narcotic offenses after naloxegol was removed from the federal controlled substances schedule did not qualify as "controlled substance offenses." See, e.g., Gov't Sent. Ltr., United States v. Disla, 20 Cr. 222, Dkt. No. 23 (S.D.N.Y. Nov. 23, 2020) (Hellerstein, J.). Several judges within this Circuit agree. See, e.g., United States v. Savinon, 21 Cr. 233, Dkt. No. 25 (S.D.N.Y. Oct. 1, 2021) (Liman, J.); United States v. Galdieri, 19 Cr. 757, Dkt. No. 143 (S.D.N.Y. Oct. 5, 2021) (Furman, J.).[8]

---

[5] The government filed a notice of appeal in Minter. See Dkt. No. 77.

[6] This transcript is not yet available to the public on PACER. It can be provided to the Court.

[7] The federal schedule was modified on January 23, 2015. Compare 21 C.F.R. § 1308.12 (enacted Jan. 23, 2015) with 21 C.F.R. § 1308.12 (enacted Jan. 27, 2012).

[8] A number of Courts in this District have also found a categorical mismatch when the prior N.Y. state conviction was incurred before the deletion of naloxegol, finding that the federal drug schedule in effect at the time of the sentencing applies. See, e.g., United States v. Smith, 20 Cr.

Therefore, because Mr. Charles' state statute of prior conviction is a categorical mismatch with the federal definition – for both reasons described herein – and as the Courts have overwhelming already found: this Court should find that Mr. Charles' 2016 § 220.16(1) conviction is not a "controlled substance offense," and thus, cannot be used to increase his base offense level.

Thus, the properly-calculated guidelines range is 30 to 37 months.

**Appropriate Sentence**

A sentence of time served with supervised release, home detention, and a community service obligation will sufficiently satisfy the statutory goals of sentencing.[9]

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)." Id. "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." Id. The guidelines, of course, are advisory and this Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007). In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (2011) (citations omitted).

Current Conditions Make Prison Unduly Punitive

Even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom," because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." United States v. Sayoc, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019). But the enduring COVID-19 pandemic[10] makes any incarceratory sentence excessively harsh. We urge the Court to consider this new reality as it decides on the appropriate sentence. As Judge McMahon put it, "in

---

317 (S.D.N.Y. Feb. 3, 2022) (Swain, J.); United States v. Butler, 19 Cr. 177, Dkt. No. 26 (S.D.N.Y. Feb. 12, 2020) (Daniels, J.); United States v. Augustine, 17 Cr. 753, Dkt. No. 332 (S.D.N.Y. Sept. 19, 2019) (Seibel, J.); United States v. Santana, 18 Cr. 865, Dkt. No. 43 (S.D.N.Y. Aug. 22, 2019) (Caproni, J.).

[9] This is the appropriate sentence even under the government and Probation's erroneously calculated guidelines range.

[10] The virus continues to change, and people continue to be infected, as new variants emerge. See Kathy Katella, 9 Things Everyone Should Know about the Coronavirus Outbreak, Yale Medicine, Aug. 11, 2022, available at https://www.yalemedicine.org/news/2019-novel-coronavirus.

ordinary circumstances, I would have probably felt it necessary…to send you away for a while. I'm not going to do that because of the circumstances in which we find ourselves…with conditions getting worse all over the country, to put you in and to break up another family and to put your life in danger in that way." United States v. Camacho, 19 Cr. 389 (CM), Dkt. No. 77 (Dec. 18, 2020); see also United States v. Cirino, 19 Cr. 323 (JSR) (July 17, 2020) ("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); United States v. Diaz, 20 Cr. 305 (DLC), Dkt. No. 52 (Feb. 25, 2021) (recognizing the "circumstances…[of] incarcerat[ion] are harsh and unusual because of the pandemic. I am going to take that into account in determining what sentence to impose."). Judge Engelmayer explained: "Prison is uniquely hard these days." United States v. Hagood, 20 Cr. 646 (PAE), Dkt. No. 63 (Nov. 11, 2021). "There are all sorts of restrictions on access to family, on access to counsel, on access to telephones, on access sometimes to legal materials, and it's a much harder experience[.] I've seen this in case after case during COVID." Id.

During the pandemic, people in federal prisons have lived with unprecedented conditions: lockdowns and lock-ins have become commonplace. Such restrictions deprive people of the most basic tools that were traditionally used to promote their sanity and rehabilitation: visits, hot food, regular exercise, and educational programming. As a result, every day of incarceration in the federal system is harsher than it used to be. We urge the Court to consider this new reality as it decides on the appropriate sentence.

Unfortunately, the pandemic is far from over. ████████████████████████████ ████████████████████████████████████████████████████ Incarceration under these circumstances is both unnecessary and needlessly punitive.

<u>A Time Served Sentence Will Prevent Unwarranted Disparities</u>

In 2021, this district sentenced 99 firearms cases, and 66.7% of those defendants received a sentence below their advisory Guideline range. See Table 10, U.S.S.C., Statistical Information Packet, Fiscal Year 2021.[11]

Sentences of time served have been imposed in many gun cases in this district. Such sentences are most common in cases like Mr. Charles', where the defendant has been charged with possession of a weapon and is not accused of doing anything with it. See, e.g., United States v. Minaya, 19 Cr. 487 (CM), Dkt. Nos. 30, 31 (Oct. 14, 2021) (time served (no jail time) followed by three years supervised release); United States v. Figueroa, 18 Cr. 293 (ER), Dkt. No. 44 (Apr. 17, 2019) (time served (no jail time) followed by one year home detention and three years supervised release); United States v. Mouzon, 16 Cr. 284 (CM), Dkt. No. 53 (Mar. 27, 2017) (time served (no jail) with 18 months home detention as part of three years of supervised release); United States v. Garcia, 18 Cr. 178 (AT), Dkt. No. 50 (Mar. 7, 2019) (time served (no

---

[11] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/nys21.pdf.

jail time) with inpatient treatment and three years of supervised release); United States v. Goodman, 16 Cr. 693 (PGG), Dkt. No. 20 (Feb. 10, 2017) (time served (no jail time) with two years of supervised release including community service); United States v. Sanchez, 17 Cr. 303 (VM) Dkt. Nos. 5, 22 (Oct. 24, 2017) (time served (no jail time) followed by seven months home confinement and three years supervised release); United States v. Lawrence, 21 Cr. 127 (PGG) (Aug. 18, 2022) (time served (no jail time) followed by supervised release and 200 hours of community service).

### Time Served and Supervised Release will Enable Mr. Charles to Continue His Positive Trajectory

The continued restraints imposed by supervised release will adequately deter Mr. Charles while allowing him to stay on his path towards rehabilitation. "Offenders on probation are…subject to several standard conditions that substantially restrict their liberty." Gall, 552 U.S. at 48; see also id. n.4 ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society") (internal citations omitted). The United States Probation Department will closely monitor his progress – as Pretrial Services has done for the last 12 months – to ensure that he remains on the right path.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That track record can give the Court confidence that he will continue to benefit from such services in the future. Most importantly, these types of programs – which the U.S. Probation Office is well-situated to facilitate – directly target the underlying causes of Mr. Charles' poor choices. As a result, Probation can help him be a better person, father, and member of the community.

### The Court has Non-Incarceratory Tools at its Disposal to Further the Statutory Goals of Sentencing

"Being the educator and advocate that I am, I do not believe that a lengthy prison term or jail is the answer for Mr. Charles. I believe that community outreach and mentoring other people at risk will be a more resourceful use of his time." Exhibit G, Letter from Pia Turner.

Requiring community service as part of Mr. Charles' sentence would further remind him – during each minute of his service – of the lessons he is supposed to take from this prosecution: do not commit this crime again. Specifically, requiring Mr. Charles to do his service at a community-based anti-violence organization would be a well-tailored resolution for the instant offense. For example, SAVE Harlem, located in Upper Manhattan, "enlists community members affected by violence to help keep their peers safe — often without involving law enforcement — has gained popularity as one practical method to ease America's gun violence crisis."[12] Mr. Charles can share his story with others to show the negative consequences that guns can have on a person's life. What better way to atone for a gun crime than helping to keep guns off the same

---

[12] Chip Brownlee, There Are Only Two City-Funded Violence Prevention Sites Tackling Surging Violence in Upper Manhattan, The Trace, Nov. 8, 2021 available at https://www.thetrace.org/2021/11/nyc-gun-violence-prevention-shootings-save-harlem/.

streets? What better way to teach lessons of deterrence and rehabilitation? Mr. Charles would also be well-suited to volunteer with children and teenagers in his neighborhood – to allow them to learn from his mistakes and make better, pro-social choices.

The Court could also require Mr. Charles to continue wearing his ankle bracelet as a condition of his supervised release. Electronic monitoring would keep him on a strict schedule and monitor his movements. Electronic monitoring and community service are important tools for punishment, as well as specific and general deterrence.

### The Requested Sentence Will Enable Mr. Charles to Continue to Give and Receive Support to and from his Family

Mr. Charles' family needs him at home. "All three of Durell's sons are taking the possibility of Durell going away really hard. It is a horrible feeling for any child to have their father ripped away from them." Exhibit D, Letter from Regina Roundtree. "The thought of me leaving my kids' side and having to be incarcerated hurts me to the core…They don't deserve that. [It] was my crime and I am terribly sorry that they will have to pay for it." Exhibit A, Letter from Mr. Charles. ▮▮▮▮ mother writes:

> If Durell is put away, it would cause a great imbalance in my son's life because he would lose all consistency to his schedule….I would have to rely on various friends and family members for childcare help, which means ▮▮▮▮ would be bounced around from place to place depending on where I find someone who can watch him. I don't even know how I would get him to school because he goes to school in New York, and I live in New Jersey. It would disrupt his sleep, it would disrupt his schooling, it would disrupt his life as he knows it.

Exhibit B, Letter from Sheila Lamarr.

> If Durell had to go to jail for this case, it would have a large impact on me, my son, and Durell's other children. Already I've noticed changes in ▮▮▮▮ mood. He's been more down lately, and I can see that he's hurting. He's worried about something happening to his dad while he's in jail, and he'll miss seeing his dad's side of the family as often as he does now because he won't be coming up to Harlem without his dad there….Even though he knows Durell will remain a part of his life even if he's in jail, it just won't be the same as having him physically present…and I don't want him to go through that.

Exhibit C, Letter from Mariah Shuemake. "Not only would Durell going away emotionally impact my son, but it will pose a financial burden on me…I need Durell's help keeping up with all our son's needs, emotionally and financially, as he grows up, and that requires him to be home." Id.

As described above, Mr. Charles' mother also needs him. She writes: "Personally, I need Durell here to take care of me. All my other kids work, and the few hours I get my home attendant isn't enough…I truly don't know that I'll do if Durell has to go to jail. It will hurt a

lot." Exhibit D Letter from Regina Roundtree. His sister explains: "My sister and I can't help our mom because we're at work all day… There's no plan B, there's no one who could fill Durell's spot in all our lives." Exhibit E, Letter from Deshawna Simmons.

Just facing the possibility of jail time for the last year has had the necessary deterrent effect: "Durell is trying to be strong right now, but I can see that he's a nervous wreck." Exhibit D, Letter from Regina Roundtree. Mr. Charles has also used his criminal charges as a lesson for himself and his sons: "By talking to the boys about his case, Durell is trying to use this experience as a lesson to them that you can't do wrong things." Id. Mr. Charles does not want them to follow the path he took as a young person. "Durell…talks to his kids about the choices he made and the things he wished he could go back and do differently." Exhibit I, Letter from Terry Solomon.

Mr. Charles is certainly a work in progress and still has a long way to go, but he is on the right path and off to a tremendous start. "I really see Durell starting to come into his true self, but he's still growing. He's someone who is willing to learn and grow to do things that will help him succeed in life, and he knows success won't come easy." Exhibit F, Letter from Paul Byrd. Mr. Charles writes: "I promise I have already learned from this experience and have no intentions of committing another crime again. I will not let my future become like my past." Exhibit A, Letter from Mr. Charles. Allowing him to continue on the instant trajectory is best for Mr. Charles, his family, and society.

## Conclusion

For all of these reasons, a sentence of time served with supervised release and electronic monitoring and community service is sufficient to achieve the statutory goals of sentencing.

Respectfully submitted,

/s/
Sylvie Levine
Counsel for Durell Charles